UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X

T.Z., as guardian of C.G., an Infant,

                         Plaintiff,        05-CV-5111(CPS)(JMA)

     -against-                             MEMORANDUM
                                           OPINION
The City of New York, the New York         AND ORDER
City Department of Education, Frank
DiFranco, and Robert Raskin,

                         Defendants.

--------------------------------------X

SIFTON, Senior Judge.

     Plaintiff C.G., an infant under the age of fourteen years at

the time of the events giving rise to this lawsuit, through her

guardian T.Z.,[1] commenced this action on November 1, 2005 against

defendants City of New York ("City"), the New York City

Department of Education, Frank DiFranco ("DiFranco"),[2] and Robert

Raskin ("Raskin"), in connection with an alleged sexual assault

_____

     [1] T.Z. and C.G. are proceeding under fictitious names in keeping with
Section 50-b(1) of the New York Civil Rights Law because infant plaintiff C.G.
is allegedly a victim of sexual abuse. Under that provision,
        The identity of any victim of a sex offense, as defined in article one
        hundred thirty or section 255.25, 255.26 or 255.27 of the penal law, or
        of an offense involving the alleged transmission of the human
        immunodeficiency virus, shall be confidential. No report, paper,
        picture, photograph, court file or other documents, in the custody or
        possession of any public officer or employee, which identifies such a
        victim shall be made available for public inspection. No such public
        officer or employee shall disclose any portion of any police report,
        court file, or other document, which tends to identify such a victim
        except as provided in subdivision two of this section.
McKinney's Civil Rights Law § 50-b(1).
        Infant plaintiff C.G. originally brought this action through her mother
and natural guardian, K.G. After K.G.'s death in early 2007, T.Z. became C.G's
legal guardian and was substituted as C.G.'s guardian in this action.

     [2] At times, I will refer to defendants City of New York, New York City
Department of Education and Frank DiFranco collectively as the "City
Defendants."

of C.G. by two fellow students in a classroom while defendant
Raskin was present. Plaintiff alleges violations under 42 U.S.C.
§§ 1981, 1983, and 1985; 20 U.S.C. § 1681; as well as state law
claims of negligence and infliction of emotional distress.[3]
Plaintiff seeks compensatory and punitive damages, in addition to
attorneys' fees. Now before this Court are (1) the City
Defendants' motion for summary judgment, (2) defendant Raskin's
motion for summary judgment and (3) plaintiff's cross motion for
partial summary judgment as to liability only. For the reasons
set forth below, the City Defendants' motion is granted in part
and denied in part, Raskin's motion is denied, and plaintiff's
motion is denied. Plaintiff has made no arguments as to the §
1981, § 1985, or infliction of emotional distress claims, or the
fifth "cause of action." Since the motion is not denominated a
motion for partial summary judgment, I deem these claims
abandoned.

## BACKGROUND

The following facts are taken from plaintiff's Complaint and
the submissions of the parties in connection with this motion.

---

[3] Plaintiff states what purports to be a separate claim against all
defendants, on the ground that all defendants are liable under New York law
because "[t]he acts and/or omissions of defendants, their agents, employees
and/or servants resulted in infant plaintiff C.G. losing her passion and love
of life, altering her relationship with her immediate family and friends, and
impairing her ability to participate in the activities that were formerly
central to her life ." Complaint ¶¶ 110-11.

Disputes are noted.[4]


*Factual History*

Plaintiff C.G. is a minor, born on June 28, 1991. At all times relevant to this action, C.G. was enrolled at Junior High School 278 ("JHS 278") as a special needs student. JHS 278 is located in Kings County, New York.

Defendant City of New York is a municipal corporation existing under the laws of the State of New York. Defendant New

---

[4]In its opposition to plaintiff's memorandum in support of her motion for summary judgment, the City defendants assert that certain evidence submitted by plaintiff should be stricken pursuant to Federal Rule of Civil Procedure 56(e)(1). The challenged documents are those submitted in Exhibit J to the Bryer Affidavit, which include written statements by student witnesses to the 2004 sexual assault on C.G., uncertified medical records, school correspondence, Department of Education occurrence reports, report cards, student statements, Chancellor's Regulations, the parent Handbook and School Rules, and excerpts of testimony from the suspension hearing following the assault on C.G. The City argues that these documents contain or are entirely comprised of hearsay and are therefore inadmissible, and requests that the Court strike these portions. *See Hollander v. American Cynamid Co.*, 172 F.3d 192, 298 (2d Cir. 1999) (a court may strike portions of an affidavit "not based upon the affiant's personal knowledge, [that] contain inadmissible hearsay or make generalized and conclusory statements.").

A motion to strike pursuant to Rule 56(e) will be ineffective unless it identifies the defects in the documents under attack with "adequate specificity." *DeCintio v. Westchester Co. Med. Ctr.*, 821 F.2d 111, 114 n.3 (2d Cir. 1987). In this case, the City has made a broad challenge encompassing numerous pages of documents of diverse origin and character, contending that those documents contain hearsay, without specifying which portions are hearsay and why. Furthermore, the City has itself relied on some of the documents in its Rule 56.1 response, indicating that it deems them admissible for consideration on summary judgment. Plaintiff has supplied the following documentation in support of admission: an affidavit certifying C.G.'s medical records, affidavits certifying C.G.'s report cards and witness statement, certification pages for the suspension hearing testimony, and deposition testimony establishing the authenticity and admissibility of the remaining documents. In addition to this documentation, plaintiff has made detailed arguments as to the admissibility of the challenged documents, including a discussion of how they fall into various exceptions to the hearsay rule. *See* Pl. Reply at I(A-P). The City has not responded to these arguments.

In light of plaintiff's careful documentation of the admissibility of the evidence she has submitted and the City's failure to respond to these arguments, the City's request to strike the documents is denied.

York City Department of Education is an agency of defendant City, with control over the City's public schools. Defendant Education Department receives federal financial assistance. Defendant Raskin is a teacher employed at JHS 278 and is an employee of the City and the Education Department. Defendant DiFranco was an assistant principal at JHS 278 and was employed by the City and the Education Department at the time of the events giving rise to the complaint.

Plaintiff was a seventh-grade student at JHS 278 during the 2004-2005 school year, and was enrolled in defendant Raskin's third period computer class. Deposition of C.G. at 14, 42 ("C.G. Dep."). There were approximately 27 to 29 students in the class. Deposition of Robert Raskin at 120 ("Raskin Dep."). Plaintiff alleges that on November 9, 2004, during Raskin's computer class, she was sexually assaulted by two fellow students in the back of the classroom while Raskin was present, and that although she called for help, Raskin did not assist her. Plaintiff further states that, five weeks after this assault, she was suspended from school for five days following a fight with a male student, which she alleges was unfair given that the male student was not disciplined, and was imposed in retaliation against her for asserting her rights. In support of her argument that the school administration and City were at fault with respect to her assault, plaintiff refers to two earlier incidents in which

female students were assaulted at JHS 278, one in 2000 that took
place in the school schoolyard and one in 2003 that took place in
Raskin's classroom. These incidents are described in further
detail below.

Configuration of Raskin's Computer Classroom and Rules

During the times relevant to this litigation, Raskin's
computer classroom was located in Room 204 at JHS 278. Raskin
Dep. at 65. There were 35 student computer work stations in the
room. *Id*. at 66. The computer systems were set on four rows of
tables running from the front to the back of the room. *Id*. at 67.
Each system consisted of a six inch tall computer base with a
monitor on top. *Id*. at 73. Raskin's desk was situated at the
front of the rectangular classroom, toward the right corner of
the room, next to the front door. Ha Decl. Ex. B (drawing made by
plaintiff of the classroom). At the back of the room were two
tables and several storage cabinets. *Id*. Raskin often provided
"one-on-one" assistance to students at their workstations, which
sometimes required sitting down at the work station. Raskin Dep.
at 75-76, 108. Due to the height of the computer monitors,
Raskin's line of sight was obscured when he was sitting at a work
station. *Id*. at 79.

With limited exceptions, Raskin required students to stay in
their seats and not talk during class or to limit their talking

during class. C.G. Dep. at 16-17. On occasion, when a student
came back from being out of the classroom or near the end of a
class period, Raskin allowed the student to take a break and sit
away from his or her computer or sit and talk to another student.
Raskin Dep. at 212-213. On some occasions, close to the holidays
and close to the end of a class period, Raskin would permit a few
students at a time to play cards in the back of the classroom if
they were finished with their work. Raskin Dep. at 93.


November 9, 2004 Incident

At some time during Raskin's third period computer class,
C.G. left class to speak to her guidance counselor. C.G. Dep. at
56, 59-60. C.G. states that she returned to class with 25 minutes
left in the class period; Raskin states that she returned with no
more than ten minutes left in the period. C.G. Dep. at 73-74;
Raskin Dep. at 211. C.G. testified that when she returned, a
number of students were standing up and talking loudly. C.G. Dep.
at 75. C.G. saw Raskin working on his computer at his desk. *Id*.
at 71. Raskin told members of the class to sit down and be quiet
more than once. *Id*. at 78-79.

C.G. next saw Laurie Touzalin ("Laurie") and Tamaine Wallace
("Tamaine") touching a student named Shanique on her breasts over
her shirt. C.G. Dep. at 61. The students were located towards the
back of the room. *Id*. Shanique was telling Laurie and Tamaine to

stop, while giggling as if being tickled. *Id*. at 62, 69. C.G.
approached Laurie and Tamaine and told them to leave Shanique
alone; she did not tell Raskin what had happened to Shanique, and
C.G. saw no indication that Raskin knew what was happening. *Id*.
at 65, 68. With Raskin's permission, C.G. then sat down in the
back corner of the room to talk to Shanique and another friend.
Raskin Dep. at 213; *Id*. at 70. After C.G. talked to Shanique for
five or six minutes, Tamaine began chasing her around the room.
C.G. Dep. at 75. C.G. told Raskin to make Tamaine leave her alone
but Raskin instead told her to sit down. *Id*. at 75-76. C.G.
returned to sitting with Shanique and her friend in the back
corner of the room, where she could not see Raskin because the
computers on the tables blocked the view of the front of the
classroom. *Id*. at 77-78.

Laurie approached C.G. and asked her for a hug; C.G.
refused. C.G. Dep. at 79. Laurie hugged C.G. from behind and
began touching her breasts while she tried to fight him off by
kicking and biting. *Id*. at 81. C.G. was facing the back of the
room at this time. *Id*. at 85. Next, Tamaine walked up to
plaintiff and told Laurie to hold down plaintiffs legs as he
began touching her breasts. *Id*. at 86. Tamaine then touched C.G.
on her vagina and buttocks outside of her clothing, after which
he pulled her pants down and caressed her buttocks. *Id*. at 86-89.
By this time there was a crowd of students around plaintiff, who

was slouched down in her chair. *Id*. at 92-93, 88. C.G. was
yelling loudly for help, but did not call out to Raskin in
particular. *Id*. at 83, 88, 97. The incident ended when C.G.'s
friend Natalia pushed everyone out of the way and pulled Tamaine
away from her. *Id*. It is not clear how long the incident lasted.[5]
Afterwards, plaintiff was crying in Natalia's lap, at which point
Raskin approached and told her to get up and go to her seat. *Id*.
at 90. C.G. did not tell Raskin what happened to her. *Id*.

Raskin states that in the last 10 minutes of class, he was
walking around the room and helping students with problems.
Raskin Dep. at 214. At some point he returned to the front of the
room to open the door for two students returning from the
counselor's office. *Id*. at 217. He then saw a student in the
third seat in the first row, which was near the front side of the
room by the door, raise her hand for help. *Id*. at 221-222. He
found that her computer was frozen and she was in danger of
losing her work; he attempted to help her at her desk, but was
unsuccessful, after which he returned to his own work station to
recover the file. *Id*. at 224-225. Soon afterwards, the end of
class bell rang. *Id*. at 226. Raskin states that he did not see

---

[5]Plaintiff estimated during her deposition in 2007 that the incident
lasted five, six, or seven minutes. C.G. Dep. at 88. In 2005, when plaintiff
was examined pursuant to the initial investigation of the incident, she stated
that she could not remember how long the incident took, but that it "seemed
like forever" to her. Examination of C.G. on June 28, 2005, at 58, attached as
Exhibit I to Declaration of Meghan Cavalieri in Further Support of Summary
Judgment Motion.

and was not aware of the alleged assault on C.G. while it was happening, and did not learn of it until a week later. Raskin Dep. at 230, 194-195. Raskin further states that no one in the classroom told him about the alleged assault at the time. *Id*. at 227.

After the incident, C.G. went to her homeroom class, but did not tell either of her teachers what had happened. C.G. Dep. at 101-102. After C.G. described to Natalia and Shanique what had happened, Natalia informed her homeroom teacher of the incident. *Id*. at 104-105. The teacher approached C.G. and asked that she write down a statement, after which C.G. met with the assistant principal and the police and C.G.'s family were called. *Id*. at 105-108. After being informed of the incident, defendant assistant principal DiFranco asked C.G. to write another statement, interviewed witnesses to the incident, and asked the students to write statements. Deposition of Frank DiFranco at 109, Cavalieri Ex. G ("DiFranco Dep.").

Eight students gave statements on the day of the incident describing what they had seen in the classroom. Each narrative stated that C.G. had been held down and assaulted by Tamaine and Laurie. Ha Decl. Ex. G.[6]

---

[6]The parties dispute the meaning of a line in one of the student accounts, which reads, in full: "I saw Tamaine and Laurie touching all over [C.G.] on her chest and on her butt and her privet end. She came to sit next to Shanique and Elena then Elena got up so they came to [C.G.] and she came to Mr. Raskin but he did not do anything he told her to sit down. The pulled down her pants and her panty and they showed her butt cheeks. They pulled down her

Principal Garofalo determined that Raskin had not provided a safe environment for his students and that C.G. had been assaulted due to Raskin's negligence. Bryer Aff., Ex. J. at 150. Raskin received no discipline other than having a letter put in his file, in which Garofalo directed him to circulate the room at all times when teaching class and to make phone calls home to parents who were not following classroom rules. *Id.*

Regarding any prior behavior that could have indicated to Raskin that C.G. was under threat of sexual assault in his classroom, Raskin stated that C.G. had previously "tak[en] issue with some things or gestures boys may have said or made towards her in the classroom but it was a thing of the moment easily stopped." Raskin Dep. at 185. The gestures included grunting and sounds, but were not of a sexual nature. *Id*. at 185-186.

After the incident, Laurie and Tamaine were taken out of C.G.'s class and were never in the same class as C.G. again. C.G. Dep. at 114, 116. C.G. testified at suspension hearings for

---

shirt and they saw her breast. Then Natalia went over there and helped her up and she said y'all play too much." Ha Decl., Ex. G at 730. Plaintiff argues that this account indicates that a girl told Raskin that C.G. was being assaulted and Raskin did nothing. Defendant responds that the description of talking to Raskin refers to an earlier incident in the class, when C.G. was being chased by Tamaine and told Raskin about it, but Raskin told her to sit down rather than asking Tamaine to stop. The latter account is consistent with the other accounts on the record and follows the time line as established by C.G.'s own account: C.G. sat with two female friends, then got up and was chased by Tamaine, then was told to sit down, after which she was assaulted. However, the first line of the statement begins to describe events from the time of the incident. To the extent that interpretation of this statement is material to the determination of whether Raskin knew of the assault as it was taking place but chose to ignore it, it cannot be resolved here.

Laurie and Tamaine, who were as a result suspended for 87 days.
Garofalo Dep. at 194-195, Cavalieri Ex. H. After serving their
suspension, Laurie and Tamaine returned to JHS 278 on April 18,
2005. Bryer Aff., Ex. J at 148. They were transferred out of the
school in October, 2005. *Id*. After his return to school, Laurie
would stare at C.G. when he saw her. C.G. Dep. at 116. During
eighth grade, after the boys were transferred out of the school,
plaintiff saw Tamaine by the front desk and had a panic attack.
*Id*. at 117.

Following the incident, C.G.'s grades in seventh grade
dropped from an average of 72 to an average of 64. Bryer Aff.,
Ex. J at 161. However, her grades improved again in eighth grade.
C.G. Dep. at 182. C.G. had 29 absences from school in the spring
term after the assault, compared to 28 for the entire previous
year. *Id.* C.G. entered psychotherapy as a result of the assault
and was diagnosed with post-traumatic stress disorder. *Id*. at 22.
C.G. suffered self-cutting, nightmares, flashbacks, panic
attacks, loss of concentration, loss of energy, impulsive
aggression against boys, and difficulty sleeping. *Id*. at 1-6.


December 13, 2004 Incident

On December 7, 2004, C.G. and fellow student Daniel Douglas
("Daniel") got into an argument in the classroom and hit each
other several times. C.G. Dep. at 130. C.G. told Daniel that she

was going to "get him" after school on the bus and warned him to "watch out." *Id*. at 131. On the bus, Daniel pushed C.G. and she hit him repeatedly in the back of the head and neck. *Id*. at 136-137. Daniel began to cry. C.G. Dep. at 137. Daniel and C.G. got off the bus, after which Daniel's mother saw them in the street, screamed at him for letting himself be beaten by a girl, and told him to hit her back. *Id*. at 138-39. Daniel then punched C.G. and she punched him back several times. *Id*. The school guidance counselor stated that Daniel told her that C.G. hit him with an umbrella on the bus. Deposition of Elyse Epstein at 221, Bryer Aff. Ex. F. After the school was informed of the fight, assistant principal DiFranco took statements and set up a meeting with C.G., Daniel, and their mothers. DiFranco Dep. at 157. During the meeting, DiFranco called C.G. "not a victim but a thug." Pl. 56.1 Statement at ¶ 65. Meeting Tape. Based on the severity of the fight and the fact that Daniel did not fight back on the bus, school officials, including Principal Garofalo, agreed that C.G. would be suspended for five days on school grounds. DiFranco Dep. at 183; Bryer Ex. J. at 132. C.G. testified that Mr. Montalbano, another school official, had decided that she should receive the suspension. C.G. Dep. at 142. Both Principal Garofalo and DiFranco stated in their Letters to File that school officials agreed to a five-day suspension "as opposed to a Superintendent suspension," which is a more serious penalty. Bryer Ex. J at 131,

132. In addition, DiFranco gave as a reason for the outcome the fact that C.G. "brutally beat" Daniel. DiFranco Dep. at 188. Daniel was not suspended, and received only verbal reprimands. Garofalo Dep. at 137.

December, 2003 Classroom Incident

On December 12, 2003, students reported that two male students held down a female student in Raskin's computer classroom while a third male student attempted to put his penis into her mouth. Bryer Aff. Ex. J at 645 (incident report), 858 (testimony of female student at suspension hearing). The female student was lying flat on the floor during the incident. *Id*. at 858. Raskin was in the room when this sexual assault occurred. Raskin Dep. at 110-111. At the time, the children were talking loudly and Raskin did not hear anyone calling out for help. Garofalo Dep. at 219.

After the incident, Principal Garofalo summoned Raskin to a meeting at which he stated that he found it difficult to believe that the assault could have occurred. Raskin Dep. at 110-11. Principal Garofalo determined that a sexual assault had occurred, and was concerned about the safety and welfare of the students as a result of the incident. Garofalo Dep. at 166, 223. Garofalo reported to the local institutional superintendent that a girl was held down by two boys but not that there was a sexual

assault. Deposition of Wendy Karp at 24 ("Karp Dep."). She placed a letter in Raskin's file and instructed him to be more vigilant about circulating around his classroom in the future. *Id*. at 178, 182. She advised him to have less direct student involvement at work stations, to stand up more, and to have students describe their difficulties so that he would not need to sit down at computers to help students directly. Raskin Dep. at 107. Garofalo determined that additional supervision of Raskin himself was unnecessary. *Id*. at 230.

Wendy Karp, who was Principal Garofalo's supervisor at the time, testified that it was Garofalo's responsibility to determine whether or not an incident occurred and whether or not disciplinary action was warranted for a teacher who was present. *Id*. at 27. Karp stated that, had she been informed of the nature of the assault, she might have advised Garofalo to call the regional attorney. *Id*. at 33. As principal, Garofalo retained authority to determine what discipline was warranted following a disciplinary conference with Raskin. *Id*. at 30, 36, 39.

June, 2000 Schoolyard Incident

On June 9, 2000, 35 teachers at JHS 278 unexpectedly took a day off, leaving then Principal Quigley very short-staffed, as substitutes were not available. Report to Chancellor Harold Levy at 1, Bryer Aff. Ex. K. The principal declared an "extended

recess" and sent hundreds of students into the schoolyard without
adequate faculty supervision. *Id.* at 2. During this recess, at
least eight female students were sexually molested and groped by
male students. *Id.* at 3-4. School officials directed the victims
of the assaults to give written statements and then sent them
back outside. *Id.* at 5. Two teachers, including defendant
DiFranco, attempted to locate the boys involved. *Id.* at 5. The
police were not called until the following Monday. *Id.* at 5. As a
result of the incident, a letter was put in DiFranco's file; the
letter was expunged after three years. DiFranco Dep. at 29; Bryer
Aff. Ex. J. at 1557. A report by the Special Commissioner for
Investigation for the New York City school district found that
school officials, including defendant DiFranco, were at fault for
mishandling the incident and being insensitive to the victims.
Bryer Aff. Ex. K. at 7-8.


Other Prior Sexual Assaults at JHS 278

Plaintiff has submitted evidence of six instances of
inappropriate touching by male students of female students at the
school. The first three are documented by incident reports: a
male student exposed himself to a female student, a male student
touched a female student on the breasts in the classroom, and a
male student touched a female student's breast. Bryer Aff. Ex. J
at 646, 647, 651, 1194. The latter three are not documented by

incident reports, but instead are attested to by C.G., who reported in the suspension hearing following her assault that she had been told of the assaults[7] by her guidance counselor. Bryer Aff., Ex. B. at 84-86.

## DISCUSSION

### I. Summary Judgment Standard

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110, 117

---

[7] The claimed assaults were: a male student groped a female student on the chest in the hallway, a female student suffered an unspecified sexual assault in the stairway, and two female students were touched on the buttocks and chests.

(2d Cir. 2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id*. Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a "metaphysical doubt" as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports the pleadings. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). In deciding such a motion, the trial court must determine whether "after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

## II. Title IX

Plaintiff claims that defendants are liable under Title IX, which prohibits sexual discrimination and sexual harassment in schools receiving federal funds, on the theory that defendants

should have prevented or stopped the assault on her. Plaintiff
further alleges that defendants are liable under Title IX for
retaliating against her.

## A. The Statute

Title IX of the Education Amendments of 1972 ("Title IX"),
provides that "no person in the United States shall, on the basis
of sex, be excluded from participation in, be denied the benefits
of, or be subjected to discrimination under any education program
or activity receiving Federal financial assistance." 20 U.S.C. §
1681. The Supreme Court has long "recognized an implied private
right of action under Title IX... [for] money damages." *Davis v.
Monroe Co. Bd. of Educ.*, 526 U.S. 629, 639; 19 S. Ct. 1661; 143
L. Ed. 2d 839 (1999). However, there is no individual liability
under Title IX. *See Miotto v. Yonkers Pub. Schs.*, 534 F. Supp. 2d
422, 426-7 (S.D.N.Y. 2008) (collecting cases, finding that an
"overwhelming majority of federal courts" have held that
individuals cannot be held liable under Title IX). Plaintiff's
Title IX claims against DiFranco and Raskin must be dismissed. I
consider the claim against the City of New York and New York City
Department of Education below.

## B. Liability for Student-on-Student Sexual Harassment

A plaintiff seeking recovery for a violation of Title IX

based on student-on-student harassment must prove that the alleged harassment took place in a location within the control of a recipient of federal funds. *Davis*, 526 U.S. at 645. Furthermore, a plaintiff must prove the following elements. First, an appropriate person[8] must have "actual knowledge" of the alleged discrimination or harassment, *Id*. at 650. Second, a funding recipient is liable for student-on-student harassment only if "the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities," and the deliberate indifference "subjected" the plaintiff to discrimination. *Davis*, 526 U.S. at 633, 640-41. Third, the discrimination must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id*. at 633.

There is no dispute that the City defendants receive federal funding or that the alleged incident took place on school property in a classroom. Nor is there any dispute that Raskin, who was in the room at the time of the assault, was a teacher with the authority to take corrective action to end the sexual assault if he knew it was occurring. The discussion below addresses the remaining elements of 'actual knowledge,' deliberate indifference, and the severity, pervasiveness, and

---

[8]"[A]n 'appropriate person'... is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290; 118 S. Ct. 1989; 141 L. Ed. 2d 277 (1998).

offensiveness of the alleged harassment. I conclude that
plaintiff has demonstrated a triable issue of fact as to whether
Raskin knew of the assault as it was occurring and was
deliberately indifferent to it. Because Raskin was a school
employee with the authority to intervene to stop the assault, his
knowledge and failure to act, if proven, are attributable to the
City defendants. Plaintiff's other arguments regarding the
school's alleged knowledge of prior sexual assaults and Principal
Garofalo's decision not to discipline certain teachers or take
other actions are insufficient to establish a material fact for
trial. I further conclude that, because there was a single
assault that lasted a short amount of time, the harassment was
not 'pervasive' within the meaning of Title IX, and therefore the
claim fails. Because the factors to be considered are similar to
those for plaintiff's § 1983 claims, I consider the arguments in
some detail.

**1. *Actual Knowledge***

To prevail on a Title IX claim, a plaintiff must demonstrate
that the funding recipient had actual knowledge, rather than
constructive knowledge, of the harassment. *Davis*, 526 U.S. at
646-47; *see also Gebser*, 524 U.S. at 274-75. Plaintiff claims
that the Department of Education can be charged with actual
knowledge of the harassment in four respects: (1) Raskin's

alleged knowledge of the assault while it was in progress; (2)
Raskin's alleged knowledge of previous sexual comments directed
at plaintiff; (3) Principal Garofalo's knowledge that a previous
assault had occurred in Raskin's classroom; and (4) the school's
knowledge that there existed a "sexually aggressive atmosphere"
at the school. These claims are examined below.

*a. Claim that Raskin had Knowledge of the Incident as it was
Occurring*

Raskin maintains that he was unaware of the assault, and
argues that there is no evidence on the record indicating that he
was aware of it, stating that he was located on the opposite end
of the classroom from where the assault happened,[9] no student
informed him of the assault as it was taking place, C.G. did not
call his name when she was allegedly calling for help, the
classroom was noisy, students were often out of their seats
despite Raskin's orders for students to remain seated and quiet,
the computer towers were tall and tended to obstruct his view of
the classroom, C.G. was slouched down in her chair at the rear of
the class, and the assault must have been over quickly since it
began at the very end of class. Plaintiff responds that Raskin

_____

[9]Raskin states that, at the end of the class period, he was assisting a
student at the front of the class whose computer was frozen, first working at
her station and then returning to his station to attempt to retrieve the file.

must have known about the assault, given that it lasted 5-7
minutes, there was a crowd of students surrounding plaintiff,
which should have captured Raskin's attention, and Raskin's line
of sight was not blocked if he was looking around the room from a
standing position. Plaintiff asserts that, even if Raskin did not
see the assault, he must have heard it, given C.G.'s testimony
that she was yelling loudly for help.

A claim that any reasonable person "should have known" that
a person was being assaulted is not sufficient to make out a
Title IX claim; however, "a showing that the defendant 'should
have known' can, in some circumstances, create an inference -- at
least sufficient to raise a genuine issue -- that the defendant
did know." *Gant v. Wallingford Bd. of Ed.*, 195 F.3d 134, 141 n.6
(2d Cir. 1999). In this case, plaintiff has raised as issue of
fact as to whether Raskin did know of the assault and chose to
ignore it. A reasonable fact finder could conclude that a crowd
of students at the back of the classroom surrounding a girl
yelling for help must have caught Raskin's attention, despite his
professed engagement with a student at the front of the classroom
at the end of class.

*b. Claim that Raskin Knew of Past Harassment of C.G.*

Plaintiff, citing Raskin's deposition testimony, asserts
that the attack on C.G. was the "culmination" of months of

grunting, sexual gestures, and sexual comments directed at C.G., and that Raskin had knowledge of this. However, in his deposition, Raskin stated that other students had on occasion grunted at C.G., but that the sounds were not of a sexual nature. Raskin Dep. at 185-86. There is no evidence that Raskin had any knowledge that C.G. was being particularly targeted for sexual harassment.

*c. Prior Incidents of Sexual Harassment in the School Generally and Raskin's Classroom*

Plaintiff has demonstrated that the school was aware of past incidents of sexual assault in the school, but has failed to show that the school knew of any harassment inflicted upon C.G. or by Tamaine and Laurie in the past. There is no evidence in the record that C.G. reported being subjected to sexual harassment on previous occasions, nor did C.G. ever indicate to school administrators that she did not want to be in a class with Laurie or Tamaine, nor did the school witness any incidents involving Laurie or Tamaine indicating that they posed a danger of sexual harassment or assault. Furthermore, the reports of past assaults do not indicate a pattern of abuse by any particular students, nor is there evidence of repeat victimization of particular students. The school cannot be held liable to plaintiff under Title IX for the assault against C.G. under a theory that it knew

of past assaults, given that the school's knowledge was generalized, and there was no specific threat posed to C.G. or posed by her assailants.

In *Soriano v. New York City Bd. of Educ*., 2004 U.S. Dist. LEXIS 21529, at *13 (E.D.N.Y. October 27, 2004), a fourth-grade student was sexually assaulted by three other students. The plaintiff argued that the school knew of the potential for harassment because of the general perception that the school was undisciplined. *Id*. at *13. The court rejected this argument, stating that "[e]ven if school administrators perceived the student body as a whole to be undisciplined... such a perception is insufficient to place those administrators on actual notice of sexual harassment of a particular student by another student." *Id*. Although the history of past incidents of sexual assault in this case is certainly more serious than a knowledge that a school is generally 'undisciplined,' the fact remains that school officials did not have any knowledge of any particular danger to C.G., nor did the school have reason to single out Laurie or Tamaine for additional supervision in light of past incidents.

Plaintiff cites three cases in support of her position that the City had 'actual knowledge' of harassment based on the school's knowledge of past assaults. The first, *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003), found that the school did *not* have knowledge of the plaintiff's harassment, and

as such does not help plaintiff here.[10] The other two cases cited by plaintiff concern repeated harassment by individuals who were known harassers, which is also not the case here.[11] Plaintiff maintains that the fact that an assault occurred in Raskin's classroom in the past should have alerted the school to the danger of an assault taking place there again.[12] Plaintiff does not make a persuasive argument as to why a single incident of this nature should put the school on notice that Raskin's classroom (rather than the particular students involved) was a source of danger.

---

[10]The *Hayut* court found that there was no Title IX liability for the school. Plaintiff quotes a passage that is drawn from the section discussing the § 1983 claim against a professor accused of harassing a student, which applied Title VII jurisprudence. 352 F.3d at 744.

[11]In *Williams v. Board of Regents*, 477 F.3d 1282 (11th Cir. 2007), the plaintiff was a student who had been raped by three student-athletes. The athletes were led by a transfer student who had a history of sexual assault and harassment. The Eleventh Circuit held that the school knew of the threat posed by the transfer student because it recruited and admitted him with knowledge of his history of assault. *Id*. at 1294. Therefore, the school could be held liable even though the plaintiff was assaulted only once. In *Zamora*, 414 F.Supp.2d 418, the plaintiff was a fifth grade student who was groped under her shirt by her teacher. The plaintiff offered evidence that other students had complained directly to the school and superintendent about inappropriate touching by the same teacher (who had thereby earned the nickname 'the Octopus'), but no action had been taken against the teacher. *Id*. at 420-422. The court held that "actual knowledge of a teacher's propensity... to sexually harass children may constitute actual knowledge, for purposes of a subsequent victims' Title IX claim." *Id*. at 425. In contrast, plaintiff does not allege that school officials had specific knowledge that a particular individual posed a threat to C.G.

[12]Plaintiff describes this argument as pertaining to Raskin's "proclivity to compromise students' safety and welfare by allowing sexual assaults to happen." Pl. Mem. at 15-16. Plaintiff compares this 'proclivity' to the danger posed by the teacher in *Zamora*, who sexually abused students on numerous occasions. The comparison is ill conceived. Principal Garofalo's knowledge that Raskin was unobservant is a far cry from the knowledge in *Zamora* that a specific teacher had on several occasions sexually assaulted students.

## 2. Deliberate Indifference

"Deliberate indifference may be found both when the defendant's response to known discrimination is clearly unreasonable in light of the known circumstances, and when remedial action only follows after a lengthy and unjustified delay." *Hayut*, 352 F.3d at 751; *see also Davis*, 526 U.S. at 648.[13] The deliberate indifference "must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 645. In undertaking this inquiry, "courts should refrain from second guessing the disciplinary decisions made by school administrators." *Id.* at 648. Plaintiff argues that school authorities demonstrated deliberate indifference in several forms: Raskin's alleged failure to take action despite his knowledge that an assault was taking place, the school's decision to permit Tamaine and Laurie to return to the school following their suspension, the school's failure to take more significant action against Raskin following the 2003 assault in his classroom, and the school's failure to take action to address the "culture of sexual aggressiveness" at the school. Pl. Mem. at 20.

If a jury concludes that Raskin knew about the assault on

---

[13]The Supreme Court elaborated on the 'clearly unreasonable' standard as follows: "This is not a mere 'reasonableness' standard, as the dissent assumes. In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." 526 U.S. at 649.

C.G. as it was happening, his failure to take action may amount to deliberate indifference attributable to the school. *See Davis*, 526 U.S. at 649 (total inaction in the face of known acts of sexual harassment is an unreasonable response). In this case, the deliberate indifference analysis and actual knowledge analysis are "inextricably intertwined," given that "the evidence that [Raskin] *should* have known might create an inference that [he] *did* know." *Zamora*, 414 F.Supp.2d at 242 (emphasis in original).

Plaintiff next argues that school authorities acted with deliberate indifference by permitting Tamaine and Laurie to return to the school following their suspension and prior to their transfer. The fact that school officials chose not to expel Tamaine and Laurie and permitted them to return to the school for several months before they were transferred does not amount to deliberate indifference. "[A] victim of peer harassment does not have a right to any particular remedial demand, immediate expulsion of her alleged harasser, or a remedy that would expose the school to a constitutional or statutory claim on the part of the accused." *Kelly v. Yale Univ.*, 2003 U.S. Dist. LEXIS 4543, at *11 (D. Ct. March 26, 2003). School officials responded promptly to the assault and took remedial action; plaintiff was not entitled to any particular action, such as immediate expulsion.

Plaintiff claims that the response by Principal Garofalo to the 2003 assault in Raskin's classroom was inadequate, and that

more significant action might have prevented the assault on C.G.
Although Garofalo was concerned for the safety and welfare of the
students after learning that an assault had taken place during
Raskin's class, she did not remove him from the classroom or give
him an unsatisfactory rating, as she had the authority to do.[14]
Plaintiff correctly states that courts have held that it is
deliberate indifference to respond to an incident of sexual
harassment or assault with a 'slap on the wrist.' However, the
cases cited by plaintiff concern discipline of the harasser
himself, not a person who failed to stop the harasser from
causing harm. *See Hollis v. City of Buffalo*, 28 F.Supp.2d 812,
822 (W.D.N.Y. 1998) (Title VII Case in which a three day
suspension was inadequate to prevent a supervisor from sexually
harassing his employee); *Baker v. John Morrell & Co.*, 266
F.Supp.2d 909, 957 (N.D.Ia. 2003) (Title VII case in which
cursory investigation and no formal discipline of a supervisor
who sexually harassed female employees amounted to reckless
indifference); *Zamora*, 414 F.Supp.2d at 425 (school authorities'
decision simply to warn sexually abusive teacher that he would be
punished if he repeated his conduct demonstrated deliberate
indifference under Title IX). Given that Raskin's failing was
that he did not pay enough attention to what was happening in his

---

[14]*See* Deposition of Robert Sheedy, Bryer Aff. Ex. H at 49; Bryer Aff.
Ex. J. at 1568, 1575-76.

classroom, these cases are inapposite. Garofalo's admonition to do a better job of surveillance, accompanied by a letter in his file, was not clearly unreasonable under the circumstances.

Plaintiff alleges that school authorities were deliberately indifferent to the danger of sexual aggression, citing the school's response to the 2000 schoolyard incident and the alleged failure to implement the Chancellor's regulations with respect to sexual harassment.[15] No funding recipient has been held liable under Title IX simply for failing to address the underlying causes behind a series of unrelated incidents of harassment. Furthermore, plaintiff has offered no evidence to show that, had the school taken the actions that plaintiff alleges it failed to take (such as identifying a central person to whom sexual harassment would be reported), plaintiff would not have been

---

[15]Pursuant to Chancellor's Regulation A-831 issued on July 1, 2001, student-to-student sexual harassment "consists of unwelcome and uninvited sexual advances, requests for sexual favors, sexually motivated physical conduct and other verbal, non-verbal, or physical conduct or communication of a sexual nature which is sufficiently severe, pervasive, or persistent to: (1) substantially interfere with a student's ability to participate in or benefit from an educational program, school sponsored activity or any other aspect of a student's education; or (2) create a hostile, offensive, or intimidating school environment; or (3) otherwise adversely affect a student's educational opportunities." Bryer Aff. Ex. J at 563. Principals are required to designate a staff member to receive and investigate sexual harassment complaints and report them at the regional level. *Id*. at 564. All complaints of sexual harassment are required to be investigated and, if they constitute crimes, the police must be called. *Id*. A copy of the regulation must be posted conspicuously in the school and a notice mailed each year to students and parents. *Id*. at 566-568.

Plaintiff alleges that the school did not notify students and parents of their rights, did not designate a specific person to investigate all sexual harassment claims and report the results at the regional level, did not follow up to see that harassment did not occur, did not train the staff on sexual harassment definitions and procedures, and did not follow the required reporting procedure.

assaulted. Under the *Davis* standard, a decision not to act rises to the level of deliberate indifference only when it "cause[s] students to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 645. There is no evidence of causality here.

### 3. *Severity of the Harassment and its Effects*

"Whether gender-oriented conduct rises to the level of actionable harassment... depends on a constellation of surrounding circumstances, expectations and relationships, including... the age of the... victim and the number of individuals involved." *Davis*, 526 U.S. at 651. "[P]hysically threatening or humiliating" conduct is more likely than offensive utterances to rise to the level of discrimination. *Hayut*, 352 F.3d at 745-46. Actionable claims are limited to those that have a "systemic effect" on a plaintiff's access to educational programs; a single instance of peer-on-peer harassment is unlikely to be sufficiently severe to rise to the level where relief is appropriate "in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment." *Id*. at 652-53.

Plaintiff has not presented any facts that suggest the existence of a genuine issue requiring trial with respect to this

prong of the Title IX analysis. She has alleged one instance of
sexual harassment lasting at most five or six minutes (and
possibly a much briefer time). If true, these allegations
indicate that C.G. suffered a strikingly offensive and disturbing
assault. However, plaintiff has failed to demonstrate that this
one-time assault rises to the level of pervasive harassment such
that C.G. was deprived of "equal access to an institution's
resources and opportunities."[16] *Davis*, 526 U.S. at 651.

The allegations that C.G. had nightmares, experienced
declining grades, had difficulty concentrating, suffered post-
traumatic stress disorder, and had to see a therapist, though
they indicate that C.G. suffered severely following the assault,
do not require a contrary conclusion. *See Soriano v. Bd. of*

---

[16]Plaintiff has not presented any case holding that a one-time assault
satisfies the standard for Title IX claims. She cites *Tomka v. Seiler Corp.* 66
F.3d 1295 (2d Cir. 1995), a Title VII case, in which a single incident was
found to be sufficient to merit relief. *Tomka* is applicable here, argues
plaintiff, because the standard for evaluating the sexual harassment under
Title IX is identical to that of Title VII. Plaintiff cites *Linder v. City of
New York*, 263 F.Supp.2d 585, 594 (E.D.N.Y. 2003), for the proposition that
standards for evaluating discrimination claims under Title IX and Title VII
are identical. However, *Davis* makes clear that the standards for Title IX
student-on-student harassment cases are higher than for Title VII cases. *Davis*
emphasizes that remedies are available only for systemic harms, and indicates
that Congress did not intend for relief to be available in cases of a single
instance of harassment. *See* 526 S.S. at 652-53. *Tomka*'s more expansive
standard is not applicable here.

I note that in *Williams v. Board of Regents*, cited by plaintiff for
another purpose, the Eleventh Circuit determined that a one-time rape of a
college student by four other students satisfied the requirement of
pervasiveness because it was planned in advance by two students who then
called two other students to join in assaulting plaintiff. 477 F.3d at 1298.
"The incident involved a ringleader who lured the victim to his territory and
then conspired with two friends to commit two separate acts of sexual assault
and so constitutes a continuous series of events. Although occurring in one
room over two hours, the acts are sufficient to meet the requirements of
severity and objective offensiveness." *Id*. In this case, there was no such
series of events and no evidence of a conspiracy to attack C.G.

*Educ.*, 2004 U.S. Dist. LEXIS 21529, at * 21 (E.D.N.Y. October 27, 2004) (holding that a fourth-grader who was sexually assaulted on two occasions six months apart by fellow students had not demonstrated that she was deprived of educational access, despite evidence that she was afraid to go out and play, had nightmares and declining grades, and had to see a therapist). C.G. suffered no harassment following the incident, and Tamaine and Laurie were immediately suspended and later removed from the school. There is no indication that C.G. had difficulties attending classes or was otherwise denied access to the school's resources and benefits.[17]

---

[17]Cases cited by plaintiff to support her claim that she was denied educational benefits are distinguishable on the facts. *See Hayut*, 352 F.3d 733, *John Doe, ex rel. Sally Doe v. Derby Bd. of Ed.*, 451 F.Supp.2d 438 (D. Ct. 2006), ("*Derby*"), and *Doe v. Hamden Bd. of Ed.*, 2008 U.S. Dist. LEXIS 40269 (D. Ct. May 19, 2008), ("*Hamden*"). In *Hayut*, the Court found that the following specific harms she suffered as a result of her harassment could be construed as denying plaintiff educational opportunities: being discouraged from more active involvement in classroom discussions, being compelled to take additional classes with the professor who harassed her, and feeling compelled to withdraw from school. *Hayut*, 352 F.3d at 750. In *Derby*, a 13 year old girl was raped by a 17 year old boy during the summer, after which both returned to the same school campus. *Id.* at 441. The male student was suspended for 10 days, after which he was permitted to continue attending school with plaintiff. *Id.* Plaintiff was harassed by the male student's friends and called derogatory names, which made attending school extremely difficult. *Id.* at 444. Plaintiff chose to transfer out of the school rather than continue suffering the ongoing abuse. *Id.* at 445. The court stated that the transfer was a strong indication that plaintiff had been deprived of educational opportunities. In *Hamden*, plaintiff high school student was raped by a fellow student outside of school. 2008 U.S. Dist. LEXIS 40269, at *2. The assailant remained in school without suffering discipline, and continued to harass plaintiff by attending her classes and taunting her along with his friends; the school took no action. *Id.* at *4-7. Plaintiff could not concentrate on her schoolwork and subsequently withdrew from school. *Id.* at *9. The court stated that the male student's continued presence at the school was harassment, and that further encounters between a rape victim and her attacker could be sufficiently hostile to deprive the victim of access to educational opportunities. *Id.* at *17.

## 4. Conclusion of Title IX Analysis

Although a material issue of fact exists as to whether Raskin, a person with authority to intervene and stop the assault as it was occurring, had knowledge of the assault and was deliberately indifferent to it, plaintiff's claim against the City defendants fails on the third prong, because the alleged harassment was not 'pervasive.' C.G. suffered a short, one-time assault to which school officials responded in a reasonable manner after they had notice of it. Summary Judgment is granted to the City defendants on plaintiff's Title IX claim.

## II. Retaliation under Title IX against City

Title IX retaliation claims are analyzed using the same "burden-shifting" framework set forth for Title VII cases by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).[18] *See AB ex rel. CD v. Rhinebeck Cent. Sch. Dist.*, 224 F.R.D. 144, 153 (S.D.N.Y. 2004). "To establish a *prima facie* case of retaliation, a plaintiff must show: 1) that she was engaged in protected activity by opposing a practice made unlawful by [Title IX]; 2) that the [school official] was aware of that activity; 3) that she suffered adverse [educational] action; and 4) that there was a causal connection between the protected activity and the adverse

---

[18]Both sides agree that the *McDonnell Douglas* framework applies.

action." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 79 (2d Cir
2001). The burden of proof at the prima facie stage is *de
minimis*. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d
Cir. 2000). If the plaintiff meets this burden, the defendant
must offer a legitimate non-discriminatory reason for its
actions. See *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir.
2008). If the defendant puts forth such a reason, the plaintiff
must demonstrate that there is sufficient evidence for a
reasonable fact finder to find that the reason offered by the
defendant is a mere pretext for discrimination. *See Weinstock*,
224 F.3d at 42.

The record indicates that on December 13, 2004, five weeks
after the classroom assault, C.G. had a physical fight with
Daniel, following an earlier argument in which C.G. told Daniel
to "watch out" and that she was going to "get him" on the school
bus. During the school bus ride home, C.G. punched Daniel Douglas
multiple times on his back and his head, causing Daniel to cry.
Defendant DiFranco took witness statements pertaining to the
incident and arranged a meeting with C.G.'s mother and Daniel's
mother to determine the facts and mediate. As a result of this
meeting, it was decided with the principal's agreement that C.G.
would receive a five day in-house suspension. DiFranco stated
that the suspension was warranted because C.G. had "brutally
beat" Daniel with an umbrella. Guidance Counselor Epstein stated

that Daniel had told her that he had been hit with an umbrella.

Plaintiff alleges that school officials retaliated against C.G. for "challenging the culture of sexual aggression" at her school by imposing a five-day suspension on her following the after-school fight between C.G. and fellow-student Daniel Douglas ("Daniel"). Pl. Mem. at 26. For ease of analysis, I assume that plaintiff has made out a *prima facie* case of retaliation and proceed directly to the last two steps in the burden-shifting analysis. *See Lapsley v. Columbia Univ*., 999 F. Supp. 506, 515 (S.D.N.Y. 1998) (listing cases in which the court assumed, without detailed analysis, that the plaintiff established a prima facie case of discrimination).

*1. Defendants' Non-Retaliatory Justifications*

The City defendants contend that there were legitimate, non-retaliatory reasons for C.G.'s suspension, based on the severity of the assault by C.G., which occurred after C.G. allegedly threatened Daniel and involved an umbrella used to strike Daniel multiple times over the head, and the fact that Daniel did not fight back on the school bus (although he allegedly did fight back after C.G. and Daniel got off the bus, at the instigation of his mother). Defendants emphasize that several people were involved in making the decision to suspend C.G., countering plaintiff's suggestion that DiFranco, who had

allegedly demonstrated insensitivity to sexual assault victims in the past, was mainly responsible.

## 2. Plaintiff's Evidence of Pretext

Plaintiff alleges that the reasons given for the suspension were pretextual on the following grounds: (i) the school did not discipline Daniel beyond a verbal reprimand, despite Principal Garofalo's testimony that if two students hit each other, both are to be disciplined; (ii) C.G. had no prior disciplinary history and was a special education student, which were factors to be taken into account in determining the severity of discipline; (iii) DiFranco's description of the attack as severe was belied by the fact that C.G. was smaller than Daniel, witness statements did not mention an umbrella, and Daniel did not appear to have cuts and bruises the next day; (iv) DiFranco dealt poorly with the 2000 incident of sexual assaults in the schoolyard, indicating that he was prone to insensitivity; (v) DiFranco stated during the meeting with the students' mothers that C.G. was "not a victim but a thug." Plaintiff alleges that the reasons given by defendants are weak and inconsistent, and that C.G. was punished beyond any fair measure of discipline.

## 3. Plaintiff Has Not Met Her Burden

The fact that Daniel was not disciplined does not indicate

that the City's explanation was pretextual. There is evidence that C.G. hit Daniel first, hard, and continuously on the school bus. It is not surprising that the school treated her more seriously as the aggressor. Regarding C.G.'s status as a special education student and her lack of prior record, there no suggestion in the record of what weight was to be given to such considerations; the fact that C.G. received a suspension does not indicate that school officials improperly disregarded these factors. As to the seriousness of the fight, C.G.'s small stature[19] is not inconsistent with a finding that she could inflict harm on a larger boy. Plaintiff's assertion that the record lacked evidence that C.G. used an umbrella to hit Daniel is inaccurate; school guidance counselor Elyse Epstein testified that Daniel told her this, and she presumably reported the information to school officials in charge of disciplining C.G. Furthermore, letters to file by DiFranco and Principal Garofalo indicate that the parties agreed to a five-day suspension "as opposed to a Superintendent suspension," which is a more serious penalty. Bryer Ex. J at 131, 132. Principal Garofalo stated that she agreed with the decision to impose the lesser penalty on the ground that C.G. was the victim of an assault, and sensitivity to her was warranted. *Id.* at 131.

---

[19]C.G. was 5'4" at the time and Daniel was 5'10". DiFranco Dep. at 173-74.

DiFranco's comment during the meeting that plaintiff was a "thug" is troubling. However, this statement, standing alone, does not indicate that DiFranco was retaliating against C.G. for reporting the earlier assault. Even if it could be shown that DiFranco harbored some ill will towards C.G., he did not exercise sole authority to determine her punishment, as Principal Garofalo and Mr. Montalbano were also involved in the decision. Based on the foregoing, I find that no reasonable fact finder could conclude that C.G.'s suspension following her fight with Daniel Douglas was an act of retaliation against her.[20]

## III. § 1983 Claims

42 U.S.C. § 1983 allows an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State... subjects, or causes to be subjected, any citizen of the United States... to the deprivation of any rights, privileges, or immunities secured by the Constitution and

---

[20]In addition to the retaliation claim, plaintiff's complaint alleges that she was not afforded her due process rights pursuant to the Constitution and New York Education Law § 3214 during the proceedings leading to her five-day suspension. Compl. at ¶¶ 68-69. The City defendants argue that C.G. was properly suspended for violent behavior endangering the safety of others. Plaintiff does not make this claim a cause of action, nor does she take up this argument in her summary judgment papers. She gives no indication of the manner in which her due process rights were violated, nor is there any suggestion in the record that she was deprived of notice and an opportunity to be heard as required by the statute for suspensions up to and including five days (longer suspensions require a formal hearing). *See* N.Y. C.L.S. Educ. Law. § 3214(3)(b) and (c). Accordingly, to the extent that this allegation could be construed as a separate claim for relief, the City defendants are entitled to judgment in their favor on such a claim.

laws." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights." *Baker v. McCollan*, 443 U.S. 137, 144 n. 3; 61 L. Ed. 2d 433; 99 S. Ct. 2689 (1979). It merely provides "a method for vindicating federal rights elsewhere conferred," *id.*, such as a federal statute or the Constitution. Under certain circumstances, a § 1983 claim may be maintained against a municipality. *Monell v. Dept. of Social Servs. of the City of New York*, 436 U.S. 658, 691-95; 98 S. Ct. 2018; 56 L. Ed. 2d 611 (1978).

## A. The City

Plaintiff alleges that the City is liable under 42 U.S.C. § 1983[21] for failing to prevent or stop the sexual assault on C.G. and thereby violating her bodily integrity.[22] In order to maintain a Section 1983 claim against the City defendants, plaintiff must allege 1) an official policy or custom that 2) caused her to be subjected to 3) the denial of a constitutional right. *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983);

---

[21]At the time plaintiff's original moving papers were filed, Second Circuit precedent stated that a plaintiff's § 1983 gender discrimination claims were preempted by Title IX. *See Bruneau v. South Kortright Central School Dist.*, 163 F.3d 749, 755 (2d Cir. 1998). On January 21, 2009, the Supreme Court decided *Fitzgerald v. Barnstable Sch. Comm.*, 129 S. Ct. 788; 172 L. Ed. 2d 582 (2009), which rejected the rationale of *Bruneau* and held that Title IX did not preempt § 1983 claims as to individuals or municipalities.

[22]The City has not addressed this claim, other than to state the legal standard for holding a municipality liable for a policy, practice or custom that causes a constitutional harm.

*see also Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995).

Plaintiff asserts that the School had a policy of inaction in the face of sexual assaults that caused her to be subjected to a sexual assault in violation of her right to bodily integrity. The Second Circuit has recognized a constitutional right to bodily integrity that is violated by a sexual assault by a state actor. *See United States v. Giordano*, 442 F.3d 30, 47 (2d Cir. 2006). Plaintiff has presented no precedent indicating that a right to bodily integrity is violated by a policy of inaction that results in a sexual assault by a student against a student.[23] However, assuming that plaintiff could state a claim based on a student-on-student assault, plaintiff has failed to show that the actions of school officials amounted to a policy or custom.

Under *Monell*, the City cannot be found liable unless plaintiff can establish that an official policy or tolerance of a custom resulted in the deprivation of her rights. *Monell*, 436 U.S. at 690-91. A 'custom' for purposes of *Monell* liability must be "so permanent and well settled as to constitute a custom or

---

[23]Plaintiff cites *Giordano*, which concerned an assault by a public school teacher, who is unquestionably a state actor. Furthermore, the cases cited by the *Giordano* court all concerned abuse by teachers. *See Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451-52 (5th Cir. 1994); *Spencer v. Doe*, 139 F.3d 107, 112 (2d Cir. 1998); *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 506 (6th Cir. 1996); *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 727 (3d Cir. 1989).

usage with the force of law." *Monell*, 436 U.S. at 691. Plaintiff alleges that the deprivation of her rights resulted from a custom of school officials failing to act to prevent sexual abuse. The Sixth Circuit has developed a framework for determining when a school's inaction in the face of sexual abuse of students amounts to a policy or custom for *Monell* purposes.[24] Under the Sixth Circuit's framework, plaintiff must establish:

> (1) the existence of a clear and persistent pattern of sexual abuse...;[25] (2) notice or constructive notice on the part of [school officials]; (3) the [school officials'] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [school's] custom was the 'moving force' or direct causal link in the constitutional deprivation.

*Doe v. Claiborne County, Tennessee*, 103 F.3d 495, 508 (6th Cir. 1996) (citing *City of Canton v. Harris*, 489 U.S. 378, 388-89; 103 L.Ed.2d 412; 109 S.Ct. 1197 (1989)). The evidence must show that the need to act is so obvious that the school's "conscious" decision not to act can be said to amount to a "policy" of deliberate indifference to C.G.'s constitutional right to bodily integrity. *City of Canton*, 489 U.S. at 390. "'Deliberate indifference' in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing

---

[24]Because the law of the Second Circuit until recently precluded § 1983 claims in Title IX cases, it offers little guidance for addressing this claim.

[25]The *Doe* court continues, "by school employees." For the purpose of this discussion, I assume that abuse by other students qualifies.

an obvious, deliberate indifference to sexual abuse." *Doe v. Claiborne County*, 103 F.3d at 508.[26]

Plaintiff alleges that C.G.'s injuries were caused by the following policies of inaction on the part of Principal Garofalo and her predecessor:[27] the failure to discipline DiFranco and Mr.

---

[26]This analysis is consistent with the Second Circuit's provisions for addressing 'inaction' claims arising in the context of the City failing to prevent manifest misconduct on the part of its employees: "Where... a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of background events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution." *Reynolds v. Giuliani*, 506 F.3d 183, 191-92 (2d Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 394-95; 109 S. Ct. 1197; 103 L. Ed. 2d 412 (1989)). "Specifically, *Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Id.*

The Second Circuit has also addressed the issue of constitutional liability for failure to train or supervise employees, which plaintiff cites as an example of the school's tacit approval of sexual assault. An official who fails to take obvious steps to prevent manifest misconduct is subject to suit under § 1983 where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need. *See Reynolds*, 506 F.3d at 192 (citing *City of Canton*, 489 U.S. at 397, 390). In *Walker v. City of N.Y.*, 974 F.2d 293, 297-98 (2d Cir. 1992), the Court outlined the requirements that must be met before a local government or official's failure to act amounts to deliberate indifference. A plaintiff must submit evidence that defendants knew to a moral certainty that the City would confront a given situation; the situation presented the City with a difficult choice or there was a history of its mishandling the situation; and the wrong choice by the City would frequently cause the deprivation of plaintiffs' rights. *Id.* This standard is consistent with the approach suggested by the Sixth Circuit in *Doe v. Claiborne.*

[27]A school principal has final policymaking authority in the management of the school and her conduct represents official district policy within the purview of the school. *See Rabideau v. Beekmantown Cent. Sch. Dist.*, 89 F. Supp. 2d 263, 268 (N.D.N.Y. 2000) (a school principal is the highest ranking person at the school and is direct responsible for discipline); *see also Lovell v. Comsewogue Sch. Dist.*, 214 F. Supp. 2d 319, 324 (E.D.N.Y. 2002) (to possess authority, a person "need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, she must be 'responsible under state law for making policy in that area of the [municipality's] business.'" (quoting *Jeffes v. Barnes*, 208 F.3d 49, 56 (2d Cir. 2000))). Actions taken by persons whose activities represent official policy may constitute a custom or policy for Section 1983's purposes. *Monell*, 436 U.S. at 694; *Jeffes v. Barnes*, 208 F.3d 49, 56 (2d Cir. 2000).

Montalbano following the 2000 schoolyard incident, the failure to
discipline Raskin and other teachers in whose presence assaults
occurred, the resolution of a 2003 inappropriate touching event
with an apology rather than discipline,[28] the failure to
implement provisions of the Chancellor's regulation on sexual
harassment (not giving teachers copies of the Chancellor's
regulation, not defining sexual harassment in the faculty
handbook, not designating a specific person to address sexual
harassment claims, and not posting regulations at the school
concerning harassment),[29] and the failure to notify students and
parents of the school's sexual harassment policies.[30] Pl. Reply
at 42. Taking these allegations as true, none of these alleged

_____

[28]Plaintiff cites a report, apparently from the school's files, entitled
"Anecdotal of Behavior," which indicates that two female students accused
another student of touching them on the buttocks and upper parts. The report
states that the student who was accused apologized and mediation was provided.
Bryer Aff. Ex. J at 1194.

[29]Defendants contend that many of the Chancellor's regulations were, in
fact, followed.

[30]At oral argument, plaintiff drew the Court's attention to an
observation by the Special Commissioner of Investigation in the report written
following the 2000 schoolyard assaults. The report noted that school officials
had "failed miserably" in their responsibilities toward parents of female
victims when they failed to inform parents of the nature of the incident and
told parents arriving to pick up their children that if they wanted to call
the police, they would need to do so outside of the school grounds. The report
characterized this behavior as "inexplicable insensitivity; at worst, they
were attempting to keep quiet a shameful situation which was prompted, in
part, by the lack of supervision during the extended recess." Bryer Aff. Ex K,
at 5. Attorney for plaintiff emphasized that there was an attempt to "keep
quiet" what had happened, but did not elaborate as to how this comment
pertained to plaintiff's claims. To the extent that the reference was intended
to bolster plaintiff's § 1983 claim against the City, the fact that school
officials did not tell parents what had happened in the schoolyard on the day
of the assault does not amount to a policy of inaction, absent evidence that
the school declined to punish the boys responsible for the assault or
otherwise take steps to remedy the situation.

failures taken alone or together evinces a conscious policy of inaction in the face of sexual assault. Furthermore, what is known about the school's responses to assaults indicates that the school did take action to address instances of assault and prevent future assaults. In response to the 2003 incident in Raskin's classroom, Garofalo sternly rebuked Raskin for his failure to note the assault as it was taking place and ordered him to take certain specific measures in order to better supervise his classroom. There is no indication that the boys responsible for the assault in Raskin's classroom in 2003 and for the assaults on the schoolyard in 2000 were not properly disciplined. Following the assault on C.G., the school acted quickly to take statements, notify C.G.'s family, and hold a suspension hearing, after which Laurie and Tamaine were suspended for three months and later expelled from the school. There is every indication that the school took these assaults seriously and responded as seemed appropriate. No reasonable juror could find that Garofalo was intentionally indifferent to instances of sexual assault.[31]

---

[31]Plaintiff alleges that Garofalo made a conscious decision to conceal the full extent of the 2003 incident when she informed her supervisor, Wendy Karp, that an incident had taken place in which a girl was held down by two boys, but not that one boy exposed himself and attempted to sexually assault her. Plaintiff suggests that the purpose of the alleged concealment was to forestall further investigation and corrective measures that would have ensued. Karp testified that, had she been informed that the assault was sexual in nature, she would have directed Principal Garofalo to do an investigation, interview witnesses, get a statement from Raskin, and determine if the allegation was true. Karp Dep. at 26. If the charge was true, Karp would have recommended considering discipline for Raskin and possibly speaking to an

Plaintiff offers no indication as to how the various actions she advocates (such as disciplining teachers and posting notices in the school) would have alleviated the risk of students assaulting other students. Absent such a showing, plaintiff cannot establish that the school's inaction *caused* the sexual assault on her, which is an essential element of the § 1983 claim. *See Doe v. Claiborne*, 103 F.3d at 509. Plaintiff has argued that the 2000 schoolyard assaults, the 2003 assault in Raskin's classroom, and the 2004 assault against C.G. were all a result of a failure of supervision of unruly students. There is no evidence that posting additional notices posted around school, educating teachers on the definition sexual harassment, or disciplining teachers who were unable to control their students would have had the desired effect on the negative situation giving rise to the assaults.

Summary judgment is granted to the City on this claim.


## B. DiFranco and Raskin

Plaintiff alleges that DiFranco and Raskin should be held individually liable for violating C.G.'s constitutional rights to

---

attorney about what the next steps should be, but those decisions would be left to Principal Garofalo. *Id*. at 26-27. In fact, Principal Garofalo did conduct an investigation and had a disciplinary conference with Raskin, after which she determined that putting a letter in Raskin's file was sufficient to address his failure to note and stop the assault in his classroom. Principal Garofalo's failure to inform Karp of the full extent of the assault is not significant, because Karp testified that Garofalo would have retained the discretion to determine what actions were necessary in any case.

equal treatment (regarding C.G.'s suspension) and bodily integrity.[32] The City argues that DiFranco was not responsible for C.G.'s punishment, and even if he were, he is entitled to qualified immunity. Raskin argues that, because he was not aware of the assault on C.G., his failure to take any action to prevent or stop the attack was not due to deliberate indifference and therefore does not give rise to liability until § 1983.

A § 1983 claim against an individual has two elements: (1) the defendant acted under color of state law; and (2) as a result of defendant's conduct, plaintiff suffered a denial of a federal statutory or constitutional right or privilege. *See Eagleston v. Guido*, 41 F.3d 865, 872 (2d Cir. 1994). I will assume that plaintiff has shown that DiFranco and Raskin were acting under color of state law because they were acting in their official capacities as the assistant principal of and teacher a public city school, respectively. *See Sharif v. Buck*, 338 F. Supp. 2d 435, 438 (W.D.N.Y. 2004).

## 1. *DiFranco*

Plaintiff states that C.G. was subjected to a greater

---

[32]To the extent that plaintiff asserts claims against DiFranco and Raskin in their official capacities, these claims are duplicative of her claim against the City and Department of Education, and therefore is dismissed. *See Kentucky v. Graham*, 473 U.S. 159, 165-66; 105 S. Ct. 3099; 87 L. Ed. 2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.")

penalty than Daniel Douglas when she was suspended, and asserts that this was in violation of Title IX's prohibition on differential discipline based on gender.[33] Plaintiff asserts that, even if some punishment was warranted, the severity of the punishment against C.G. was much greater than that imposed on Daniel. The City defendants have not responded to this allegation, having misconstrued plaintiff's § 1983 claim against DiFranco as one alleging that he failed to take proper remedial measures following the assault on C.G. The City argues that DiFranco is entitled to qualified immunity, which argument similarly does not address plaintiff's claim of unequal treatment.

*a. Qualified Immunity*

"Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz*, 533 U.S. 194, 200; 121 S. Ct. 2151; 150 L. Ed. 2d 272 (2001). The doctrine of qualified immunity provides "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at

---

[33]Plaintiff refers to this claim as a violation of equal protection, but cites cases that address discrimination under Title IX.

200 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)).

In general, public officials are entitled to qualified immunity if "(1) their conduct does not violate clearly established statutory or constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Holcomb v. Lykens*, 337 F.3d 217, 220 (2d Cir. 2003) (citing *Weyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996)). Under the doctrine of qualified immunity, "officials who act in ways they reasonably believe to be lawful... should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641; 107 S. Ct. 3034; 97 L. Ed. 2d 523 (1987). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id*. (quoting *Hope v. Pelzer*, 536 U.S. 730, 740-41; 122 S. Ct. 2508; 153 L. Ed. 2d 666 (2002)).

"To determine whether a particular right was clearly established at the time of the alleged offense, courts should consider: (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Frank v. Relin*, 1

F.3d 1317, 1328 (2d Cir. 1993). Immunity applies "if officers of reasonable competence could disagree" on whether the conduct at issue was unlawful. *See Malley v. Briggs*, 475 U.S. 335, 341; 106 S. Ct. 1092; 89 L. Ed. 2d 271 (1986).

In this case, the federal prohibition on gender discrimination in school was clearly established at the time of the disciplinary action in the form of Title IX. Furthermore, the prohibition of the specific form of discrimination alleged, that is imposing a more severe punishment on a student on the basis of gender, was also clearly established. *See Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1993) ("Title IX bars the imposition of [educational] discipline where gender is a motivating factor in the decision to discipline." The prohibition encompasses actions in which, "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id*.). If plaintiff shows that DiFranco imposed a more severe punishment on C.G. on the basis of her gender, DiFranco is not entitled to qualified immunity.

*b. Differential Discipline*

Plaintiff has not demonstrated the existence of a material fact as to whether DiFranco imposed a more severe punishment on her on the basis of gender. First, the record indicates that the

decision to suspend C.G. was made by a number of school
officials, including Principal Garofalo, Mr. Montalbano, and
DiFranco. Second, the record indicates that C.G. hit Daniel
Douglas repeatedly on the head and neck to the point that he
began to cry, which is not an insignificant assault, and there is
no indication that Daniel hit C.G. on the bus or otherwise
participated equally in this assault. Third, plaintiff has not
submitted evidence that other male students involved in similar
incidents were disciplined differently, such that an inference
could be drawn that plaintiff's punishment was based on her
gender. Whether or not suspension of C.G. while giving Daniel
only a verbal reprimand was the right decision, there is no
indication that the decision was taken because C.G. is female and
Daniel is male. The alleged statement by DiFranco that he called
her "not a victim but a thug" does not change the analysis, as it
contains no suggestion that C.G. ought to be more severely
punished due to her gender. Accordingly, summary judgment is
granted to DiFranco on the § 1983 claim.


### 2. Raskin

Plaintiff asserts that Raskin is liable for the violation of
C.G.'s constitutionally protected interest in bodily integrity
and violation of the clearly established right to be free from

student-on-student sexual harassment under Title IX.[34] Plaintiff

has demonstrated the existence of a material fact as to whether

Raskin did know that the assault was taking place in his

classroom and chose to ignore it.[35] If Raskin did know and did

fail to act, then his inaction would have deprived plaintiff of

her statutorily protected right to be free of student-on-student

harassment under Title IX. Defendant Raskin's motion for summary

judgment on the § 1983 claim is denied.


## IV. Negligent Supervision Claims

Plaintiff claims that the City defendants are liable under

New York State law for negligent supervision in three respects:

(1) Raskin's failure to stop C.G.'s assault while it was in

progress; (2) Raskin failing to supervise his classroom prior to

the assault in a manner that would have prevented it; (3) the

school's failure to remove Raskin from the classroom following

the 2003 assault.

A school district in New York and, presumably, teachers

within such a district, "ha[ve] the duty to exercise the same

---

[34]Plaintiff does not refer to Title IX in this section of her argument, but instead refers to *Gant v. Wallingford Bd. of Ed.*, 195 F.3d 134, 140 (2d Cir. 1999), in which a § 1983 claim for violation of rights under Title IX was raised.

[35]See discussion, Section II(B)(1), *infra*. Raskin argues that there is "insufficient evidence" from which a rational jury could conclude that Raskin was aware of the assault as it was happening. This is not the applicable standard on a motion for summary judgment. The question is whether there exists a question of material fact that merits taking the case to trial.

degree of care and supervision over the pupils under [their]
control as a reasonably prudent parent would exercise under the
same circumstances." *Mirand v. City of New York*, 84 N.Y.2d 44, 49
(N.Y. 1994). As such, it may be liable "for foreseeable injuries
proximately related to the absence of adequate supervision." *Id.*
In determining whether the duty to provide adequate supervision
has been breached in the context of injuries caused by the acts
of fellow students:

> it must be established that school authorities had
> sufficiently specific knowledge or notice of the
> dangerous conduct which caused injury; that is, that
> the third-party acts could reasonably have been
> anticipated. Actual or constructive notice to the
> school of prior similar conduct is generally required
> because, obviously, school personnel cannot reasonably
> be expected to guard against all of the sudden,
> spontaneous acts that take place among students daily;
> an injury caused by the impulsive, unanticipated act of
> a fellow student ordinarily will not give rise to a
> finding of negligence absent proof of prior conduct
> that would have put a reasonable person on notice to
> protect against the injury-causing act.

*Id.* at 49-50. "[P]roximate cause is not established in negligent
supervision cases involving sudden, unprovoked acts that are of
short duration." *Smith v. Half Hollow Hills Cent. Sch. Dist.*, 349
F. Supp. 2d 521, 526 (E.D.N.Y. 2004). "New York courts have not
hesitated to grant summary judgment to school districts... where
the district makes a prima facie showing of a lack of notice
and/or proximate cause and plaintiff fails to come forward with
factual evidence to the contrary." *Id.* at 525-26 (collecting
cases).

## A. Raskin's Failure to Stop the Assault

A teacher who witnesses a student-on-student assault has a common-law duty to "take energetic steps to intervene in time to prevent" one student from injuring another. *Siller v. Mahopac Central School Dist.*, 18 A.D.3d 532, 533 (2d Dept. 2005). In this case, there is an issue of material fact as to whether Raskin witnessed the assault on C.G. Furthermore, taking the evidence in the light most favorable to plaintiff, the assault lasted 5-7 minutes, which creates an issue of fact as to whether he had an opportunity to intervene in order to stop it. *See Thomas v. Kingston Bd. of Ed.*, 291 A.D.2d 710, 712 (3d Dept. 2002) (issue of fact as to whether school bus driver had opportunity to stop a fight lasting as long as five minutes). Raskin's citation to *Smith*, in which a student was assaulted for less than a minute in the cafeteria, is unavailing, as in that case the plaintiff did not assert that school personnel had witnessed the assault. 349 F. Supp. 2d at 527.

## B. Raskin's Supervision of His Classroom

Plaintiff alleges that if Raskin had properly supervised his classroom, the assault would not have taken place. Schools may be held liable for failure to exercise supervision to protect students from foreseeable harm. *Mirand*, 84 N.Y.2d at 49. "To find that a school district has breached its duty to provide adequate

supervision, a plaintiff must show that the district had sufficiently specific knowledge or notice of the dangerous conduct and that the alleged breach was a proximate cause of the injuries sustained." *Nocilla v. Middle Country Cent. Sch. Dist.*, 302 A.D.2d 573, 573 (4th Dept. 2003). Although the "precise manner in which the harm occurred need not be foreseeable," the harm suffered must be "with the class of reasonably foreseeable hazards the duty is intended to prevent." *Sanchez v. State of New York*, 99 N.Y.2d 247, 252; 784 N.E.2d 675; 754 N.Y.S.2d 621 (2002).

A harm may be foreseeable either because it was perpetrated by a specific student or students with known tendencies towards violence or because it occurred under dangerous circumstances that school officials should have anticipated could result in a student being harmed. *See Shante D. v. City of New York*, 190 A.D.2d 356, 362 (1st Dept. 1993) ("It was enough that plaintiff show that [the student assailant] had previously exhibited violent tendencies which should have placed the City on notice that she would, given the opportunity, assault plaintiff in the future."); *Schrader v. Bd. of Educ. of Taconic Hills Central Sch. Dist.*, 249 A.D.2d 741, 742 (3d Dept. 1998) (no liability where a female student was assaulted by two male students in the gym after they followed her out of class, because school had no notice of any risk of sexually aggressive behavior by the boys

involved); *Maynard v. Bd. of Educ*., 244 A.D.2d 622, 623 (3d Dept. 1997) (issue of fact as to negligent supervision claim where a class was generally unruly with objects being regularly thrown and on one instance a student hit another student in the eye with a pencil unintentionally); *Jacqueline S. v. City of New York*, 81 N.Y.2d 288, 598 N.Y.S.2d 160, 614 N.E.2d 723 (1993) (issue of fact as to whether City was liable for rape of girl in an unlocked utility room in a housing project, where there were many reports of drug activity and violence by intruders in the building and in the utility room, but simple self-locking doors were not installed).

Plaintiff alleges that it was foreseeable that C.G. could be sexually assaulted in Raskin's classroom because there was a pattern of undisciplined, disruptive behavior in the classroom. Plaintiff has submitted evidence that Raskin did not prevent students form leaving their seats, running around the classroom, and talking noisily, and did not regularly seek help from school security officers to bring the classroom back under control. Although some classes of injury are foreseeable as a result of the general unruliness of a classroom, such as pushing or throwing of objects, a sexual assault of the kind alleged in this case is not among them. However, Raskin's classroom was not a blank slate. The 2003 serious sexual assault, in which a girl was held down and subjected to unwanted sexual contact just as C.G.

experienced, took place under similar conditions as were present on the day C.G. was assaulted. The school was thereby made aware that it was possible that the unruly behavior taking place in Raskin's classroom could give rise to an assault. Furthermore, in 2000 several female students were assaulted in the schoolyard during a period of lessened supervision; subsequent incidents of sexual assault upon students in the school indicated that the 2000 incident was not an isolated outburst. Following the 2003 assault, Principal Garofalo urged Raskin to be more vigilant in supervision of his classroom, advising him to walk through the aisles more frequently and spend more time standing than sitting with students while helping them with their work. If it is shown that Raskin was not following these suggestions for improved supervision on the date of C.G.'s assault, but instead had permitted his classroom to become chaotic, a reasonable fact finder could conclude that the assault was foreseeable, and that the school is therefore liable for not providing better supervision of the classroom.[36]

Defendants argue that there was no evidence that either

---

[36]It is worth noting here that the different standards for Title IX and the State law negligence claims produce quite different results with respect to possible liability for failing to supervise students. Under Title IX, a plaintiff must show 'actual knowledge,' which was not demonstrated here, since school officials had no notice that there was any particular danger to C.G. or from Tamaine and Laurie. However, under New York negligent supervision law, a plaintiff need only show that an assault was foreseeable based on the dangerous environment. Hence, there is a question of material fact as to whether defendants are liable in negligence, but no question of fact for the jury as to whether defendants are liable under Title IX.

Laurie or Tamaine had previously engaged in violent or sexually aggressive behavior that would give rise to a duty to supervise them in particular. Plaintiff concedes this; her argument rests on the allegedly dangerous environment to which C.G. was subjected, not on any particular risk posed by Laurie and Tamaine that the school should have acted upon.

## C. Supervision of Raskin Following 2003 Assault

Plaintiff additionally argues that the City may be held liable for Principal Garofalo's failure to supervise Raskin and his classroom more closely following the 2003 sexual assault. A school's duty to supervise encompasses teachers as well as students, to the extent that teachers may potentially abuse students. *See Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F.Supp.2d 387, 402 (E.D.N.Y. 2005); *Doe v. Whitney*, 8 A.D.3d 610, 613 (2d Dept. 2004). Plaintiff cites no case in which a school was held liable for negligent supervision of a teacher who failed to note that an assault was taking place in his classroom. However, a reasonable fact finder could find that a "reasonably prudent parent" would invariably have supervised Raskin more closely. *Mirand*, 84 N.Y.2d at 49.

Based on the foregoing, summary judgment is denied to the City on the negligent supervision claim.

## V. Negligent retention and promotion

Plaintiff claims that the City is liable for negligent retention of Raskin following the 2003 incident and negligent promotion of DiFranco to assistant principal "despite his documented insensitivity to sexual harassment victims." Pl. Mem. at 38.

"To avoid summary judgment on the issue of negligent retention... a plaintiff must offer evidence that the defendant negligently failed to terminate an employee -- that is, that the defendant knew or should have known of the employee's propensity to commit acts meriting dismissal, yet failed to act accordingly." *Tesoriero*, 382 F. Supp. at 401-2. Plaintiff has presented no evidence that Raskin committed acts meriting dismissal. At most, she has demonstrated that Raskin could have been removed from the classroom and given a different job if it was found that he posed a danger to students. Plaintiff alleges that the school is liable for failing to 'dismiss' Raskin from classroom teaching based on his presence in the room during the 2003 assault. Plaintiff has failed to demonstrate how Raskin's unawareness that an assault was taking place constitutes a "propensity to commit acts meriting dismissal." *Id*.

Plaintiff states that the City is liable for the promotion

of DiFranco to assistant principal,[37] which placed him in a position to impose retaliatory discipline on C.G. following her fight with a fellow student, during the course of which he called her a "thug." Plaintiff alleges that DiFranco had a propensity to mishandle sexual harassment investigations, as evidenced by his allegedly deficient response to the 2000 sexual assaults in the schoolyard. Plaintiff has not demonstrated a triable issue of fact as to her retaliation claim, nor does she explain why DiFranco calling her a "thug" resulted in a harm for which the school should be liable.

Summary judgment is granted to the City on plaintiff's negligent retention and promotion claims.

## CONCLUSION

For the reasons stated herein, summary judgment is granted to the City defendants on the Title IX discrimination claim, the Title IX retaliation claim, the § 1983 claim, and the negligent retention and promotion claims. Summary judgment is granted to DiFranco on the Title IX and § 1983 claims. Summary judgment is granted to Raskin on the Title IX claim. The motions for summary judgment are denied in all other respects. The following issues

---

[37]Although negligent promotion is not part of the usual negligence framework, plaintiff asserts that negligent promotion is akin to negligent hiring, as the employer 'hires' the defendant for a new position. *See Garmella v. New York Med. College*, 23 F.Supp.2d 153, 165-66 (D. Conn. 1998) (negligent promotion claim considered).

remain for trial: whether Raskin, a school official with the authority to intervene, had actual knowledge of the assault on C.G. as it was occurring, whether Raskin was deliberately indifferent to the assault on C.G. as it was occurring, whether Raskin failed to take energetic steps to intervene in time to stop the assault on C.G., whether Raskin was negligent in his supervision of his classroom in a manner that proximately caused the assault on C.G., and whether school officials were negligent for not supervising Raskin more closely following the 2003 sexual assault in his classroom. Because no individual claims remain against defendant DiFranco, he is dismissed from this case. Raskin and the City defendants remain. The Clerk is directed to transmit a copy of the within to all parties and the assigned Magistrate Judge.

SO ORDERED.

Dated:     Brooklyn, New York
           May 21, 2009


                    By: <u>Charles P. Sifton (electronically signed)</u>
                         United States District Judge